## REGULATION OF THE JITNEY.

Common Pleas Court of Cuyahoga County.

MIKE KACZMAREK v. THE VILLAGE OF INDEPENDENCE ET AL.

Decided, July 28, 1915.

*Municipal Corporations—Authority of, to Regulate Jitney Busses in Their Use of the Streets—What Constitutes Reasonable Regulation.*

1. In the exercise of their general police power and under the authority of the statutes providing for control over the use of the streets, municipalities may regulate the operation of jutney busses. Such regulation should be reasonable, but ought to be sufficiently effective to provide for the safety of the public and protect property rights.

2. It is not unreasonable to require that one who operates jitney busses shall execute a bond in the sum of $10,000 securing payment of damages to any person or for any property injured through his negligence; that he provide continuous service at regular intervals in bad weather as well as good; that he shall be held to the same degree of care as the law imposes on other common carriers, and that he employ no chauffeur who can not speak the English language.

*Palda & Svarc*, for petitioner.
*Cline & Minshall*, contra.

FORAN, J.

This case is before the court upon an application for a writ of habeas corpus. On the 28th day of May, 1915, the petitioner, Mike Kaczmarek, was arrested upon a warrant issued by the mayor of the village of Independence, upon affidavit filed before him charging that the petitioner, without having first obtained a license from the village of Independence, did then and there use and occupy a certain street, to-wit, Brecksville road, within the corporate limits of the village of Independence with a certain automobile for the carriage of persons for hire, and did then and there operate said automobile for the purpose of affording a means of local street transportation similar to that ordinarily afforded by street railways, contrary to the provisions of ordi-

nance No. 25 of said village of Independence, Cuyahoga county, Ohio.

It appears that the village of Independence, Cuyahoga county, Ohio, in the month of April, 1915, passed an ordinance regulating vehicles and the use of the streets and requiring every person carrying on the business of transportation of passengers for hire to obtain a license before commencing business. Section 1 of this ordinance requires that a license be obtained by any person desiring to carry on the business of transporting passengers for hire within the corporate limits of the village of Independence. Section 2 provides that the route over which such persons intend to travel or carry passengers, and the schedule they expect to give, shall be designated and a map thereof furnished. Section 3 requires the owner of all vehicles to be used for such purpose to pay a license fee of twenty-five dollars, which shall be paid to the public service street repair fund. Section 4 provides that a bond in the sum of $10,000 shall be given for the operation of one or more automobiles or vehicles, conditioned to the effect that, in the event of any person or property being injured or damaged by the negligence or carelessness of the driver in the operation of the owner's automobile, the person so injured, either in person or property, may recover therefor; that is, the bond is given for the benefit of persons who may be injured in person or property by reason of the operation of such automobile or vehicle. Section 5 provides regulations as to the character and kind of person who shall be employed to drive such automobile, including his age and intelligence. Section 7 provides that the automobile so used shall be kept in a clean and sanitary condition, and contains regulations for traffic and for preventing overcrowding of such vehicles. The other sections relate to matter of administrative detail.

The petitioner claimed that his arrest was unlawful, for the reason that said ordinance is void and of no effect, in that the council had no authority to require a bond as provided for by Section 4 of said ordinance. It is also claimed that the license fee is unreasonably excessive and that the council had no authority to regulate fares; nor had the council authority to impose, as

a condition to granting a license, that the operator shall have a sufficient knowledge of the English language to carry on an intelligent conversation, as provided by Section 5 of the ordinance.

It is conceded that the petitioner, Mike Kaczmarek, does not reside in the village of Independence, and that he is not a taxpayer in said village, and that at the time of his arrest he did not operate his automobile exclusively in said village, but carried passengers from Cleveland and other localities to and through Independence, and from said village to Cleveland, and other places along Brecksville road.

The issues involved are, perhaps, new in this locality, but in western cities and in the coast cities the operation of what is known as the "jitney bus" is well known and understood. The use of the automobile as a means and mode for the transportation of passengers in cities and villages is of comparatively recent origin, and arose, as has been said, in the western cities, but has been proceeding with rapid strides all over the country.

The case was ably, skilfully and learnedly presented by counsel, and elaborate briefs, showing great research and discriminating marshaling of authorities, have been filed. To some extent the questions presented in the argument and by these briefs are new and novel, but in the final analysis the application of the old legal principles to new conditions will be found decisive of the questions involved.

The present age is one of change and transformation. The dream of yesterday is the reality of today, and the precursor of greater things for tomorrow. The tallow dip and the electric light furnish no greater contrast than the farmer's stone boat and the automobile. In every department of industry, in commerce, in travel, transportation, transmission of power, and transmission of news and thought, we see the rapid passing of one mode of doing things to some improved mode of accomplishing the same or a better result with less effort and in less time. That all rights may be preserved and all be protected, the law must meet these changing conditions in production, distribution and transportation. The jitney bus is a part of the general social and industrial evolution everywhere seen and manifested.

Electricity put the horse car and the cable car in the discard. While the jitney will have no such effect upon the electric street car, it has and will curb and destroy transportation monopolies in cities and their suburbs. For this reason the jitney should be fostered within all reasonable limitations and its rights preserved. The advent and activities of this vehicle as a mode of passenger travel has been so rapid within the last year or two that state legislatures have not had sufficient time to subject it to intelligent regulation and supervision.

No sane, thinking man will for a moment contend that a wholly irresponsible and reckless person should be permitted to operate and run an automobile as a vehicle for the transportation of passengers through the streets of a municipality or the highways between municipalities. Of necessity, then, there must be regulation and supervision. The public safety and preservation of private as well as public property rights demand that this mode of conveyance be strictly and scrupulously regulated. In the absence of statutory regulation, municipalities in the exercise of their general police power and the authority conferred upon them by statute may, we believe, within the limits of their jurisdiction, regulate the operation of jitney busses. Such regulation, of course, should be reasonable, but it ought to be sufficiently effective to protect the public and preserve property rights, for the primary object of the police power of the state and of municipalities is not alone the prevention of crime and the pursuit and punishment of offenders, but also the preservation of order, removal of obstructions and nuisance, and the adoption and enforcement of local laws for the safety, convenience and comfort of the community.

The question as to what are the proper limits of the police power of a state or municipality, while a judicial one, is not always easily answered. It may be said, in a general way, that it depends in each case upon the relation of the act in question to the situation demanding the exercise of the power. In a long list of fluctuating authorities, it has been held to include the regulation of streets, highways, bridges, carriers, peddlers, drays and vehicles of all kinds. In these respects the statutes of Ohio confer full and ample power upon municipalities.

By various sections of the General Code, municipalities are empowered to regulate the use of carts, drays, wagons, hackney coaches, omnibuses and automobiles, as well as every description of vehicle kept for hire, and to license and regulate the use of streets. The right is also given to prescribe the width of the tires of wagons and vehicles, to fix rates and prices for the transportation of persons and property from one part of a municipality to another, and by Section 3675, General Code, it is provided that all money and receipts arising from license fees shall be used for the sole purpose of repairing streets.

Section 3714, General Code, gives to municipal corporations special power to regulate the use of the streets, the power to be exercised in the manner provided by law, and the council is given the care, supervision and control of public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts and viaducts within the corporation, and it is provided in this section that all these streets, highways and alleys "shall be kept open, in repair, and free from nuisance." So it will be seen that the state has given to municipalities almost plenary power in relation to the control and management of streets and highways.

That the need of jitney regulation is important and necessary will be seen at once without the aid of any extended verbal illumination. That the automobile in the hands of an incompetent or reckless man is a dangerous menace to the public goes without saying. The daily list of deaths and accidents due to this mode of conveyance is shockingly appalling. Indeed, if the names of those who have been killed and maimed on any single day, especially Sunday, in the United States, through and by means of automobiles and electric-driven vehicles, were printed, they would occupy all the columns of an entire newspaper, and lead to the belief that the casualties due to the automobile accidents were worse than a battle in Poland or Flanders. In the hands of a competent, careful and proper person, the automobile is a blessing to civilization. The cost of constructing these vehicles has been largely reduced within recent years, and those who can afford their use are disposed to change old for new models, at least annually, if not more often, so that large indeed is the number of what are euphemistically called "used cars," and

what are in reality second-hand roadsters or touring cars. Many of these may be purchased for a mere nominal sum, and to say that any man may purchase or by some means acquire one of these discards, and carry passengers through our streets and highways, and be amenable to no authoritative regulation, is asking too much. The danger to pedestrians and other persons in vehicles of all kinds lawfully upon the highways would be vastly augmented and increased by the indiscriminate and unregulated use of such vehicles. While it is true that the jitney bus has come to stay, and has passed from the humorous to the serious stage of discussion as an economic possibility, still there are many reasons, social, economic and legal, why it should be subject to such regulation as the public safety and property rights demand. The jitney has its own probelms which can only be equitably solved by experience and demonstration. It has been carefully computed that it costs seven cents a mile to operate a jitney bus, and therefore its existence as an economic possibility depends upon short haul business, in which field it strikes directly at the profits and revenue of traction companies. The street railway companies, recognizing this, are now agitating the question of an adjustment of fares upon a per mile basis; but this can never be accomplished so long as the inhabitants of cities seek to escape congested districts and provide themselves homes as far as possible from the noise and confusion, smoke and grime, of the mercantile and factory localities. To place street car fares on a per mile basis would make it practically impossible for any but the wealthy to live in country districts, or away from the center of commercial activity. The street railway companies are in many respects partners of the cities in which they operate. The municipality grants them franchises and rights of way and other privileges, and the property owners give their consent to use the streets abutting upon their homes or places of business. In return for these privileges, the street railways agree to give continuous service at prescribed regular intervals over the streets or lines fixed by ordinance, to carry patrolmen and firemen free, to give special rates to school children, to pave certain portions of the streets, and so run or operate their cars as to best serve

the public convenience and the public safety. The street railways must operate their cars at all times irrespective of weather conditions, unless prevented by act of God or public enemy. It would be manifestly unfair to traction companies to permit the jitney, unrestricted and unregulated, to take the cream of the business without being in any way responsible for the use and the misuse of the streets and highways, and the safety of the public. The street railways pay taxes; it is right and proper that they should do so. If the jitney is to use the streets and highways, why should it not pay for such use? The license fee of $25 for one or more automobiles or jitneys, run or operated by the licensee, is really in the nature of a tax. It is not unreasonable so far as the amount is concerned.

The right to license certain occupations is no longer an open question, nor has it been since the decision of the Supreme Court of the United States in the liquor cases in 1847. See 5 Howard, 504.

We have examined the ordinance of the village of Independence, now under consideration, very carefully, and can not hold that it encroaches upon the power of the state or the supreme law of the state. The requirement of Section 4, that a bond of $10,000 be given for the benefit of any person injured or any property damaged, is not unreasonable. The jitney is, and must be held to be, a common carrier; and there is no valid reason why the highest degree of care for the safe transportation of passengers should not be exacted of those operating such vehicles. In other words, the jitney must be subject to the same law which governs all common carriers; and while it should not be unreasonably restricted, still it ought not to be accorded privileges that are not granted to other common carriers. The most that it can ask is to be placed upon the same footing or basis upon which any common carrier is placed. The man who knows he must respond in damages for careless and negligent conduct will always exercise the degree of care and caution the circumstances demand. Street railways must respond in damages if their servants negligently injure persons or property; and so must every citizen. Why not the jitney? There is a wide difference and dis-

tinction between a private automobile operated by the owner or his servant, and an automobile crowded with passengers. The distinction between the two need not be pointed out; it will appear to any person of ordinary common sense.

As we have seen, the ease with which second-hand or discarded touring cars or roadsters can be procured places it in the power of almost any person to operate a jitney. A man without character, a man wholly irresponsible and of reckless propensities, who has nothing whatever at stake, in such a jitney or operating it, is as dangerous a menace to the community as a truck load of dynamite in the custody of a drunken driver. The man whose standing and character are such that others are willing to be responsible for him in the sum of $10,000 may be safely trusted with the control and operation of a jitney bus. Besides, such a bond has a salutary effect upon the owner and operator of the jitney. If the provisions of this ordinance, even in a modified sense, could be applied to every owner and driver of an automobile, the holocaust of death and destruction, due to the use of these vehicles, would be greatly minimized. No doubt the state Legislature will deal with the jitney situation in due time, and so deal with it as to preserve it as a competitor with traction companies, and at the same time protect the public from the evils of a conveyance which, if unregulated, may become an unmitigated nuisance.

In the coast states and in the west and middle west, where the jitney has been in use, cities and villages have, by ordinance, regulated its use, and in many instances these regulations are quite restrictive and almost prohibitive, but the ordinances have been invariably upheld by the courts, so far as we are able to learn. Indeed, it may be said that the general trend of opinion in the Supreme Court of the United States since 1870 has been toward recognizing the police power of the several states as entitled to broad and wide scope. Municipalities, of course, derive their powers from the state, and there can be no question but that the statutes of this state give to municipalities ample power to pass the ordinance now under consideration, even in the absence of the adoption of a charter providing for local self-gov-

ernment, which the Constitution of September, 1912, permits municipalities to do. The trend of modern social endeavor is toward giving municipalities full power to provide for internal regulation. If jitneys are to run in our streets, or on our highways, they must not be permitted to run or operate at will, or at the pleasure and convenience of the owners of these vehicles. They must be required to give continuous service at regular intervals, the same as street car companies. They must not be permitted to run on fine days, or when weather conditions are good, and not run when weather conditions are bad. They must bear their portion of the taxes of all communities through which they operate, and they must be bonded so as to protect and indemnify all those they negligently injure, whether in person or in property. It will not avail as an answer to say that such regulation will drive the jitney out of existence, and thus the benefits of its competition with traction companies be destroyed; nor will it ·avail to say that such regulation will prevent a man of limited means from operating a jitney. The ordinance under consideration seeks to test the character and standing of a man, rather than his financial condition or status. It would be poor consolation, however, to a jitney load of persons, who are negligently injured by the careless operation of a jitney driver, to be told that the jitney was permitted to run or be operated, without security being given to the public, for the reason that the owner was unable financially to do so, and that he was permitted to operate his vehicle simply because he was a citizen and had a right to be upon the street with it.

The streets, as we have seen, are primarily for public travel; but every community is interested, and must necessarily be interested, in preserving life and limb upon the public streets; and no vehicle will be permitted to run at such a rate of speed as will endanger the life or the property of any citizen, and therefore the character of the men who operate those vehicles must necessarily be inquired into.

The claim that it is unreasonable to say that a driver of a jitney shall understand the English language, is nonsensical and foolish. The English language, whatever its origin may have

been, is the language of the United States and the American people; and it is no hardship to any man who desires to do business with the American public to require of him such a use of the English language as will enable him to intelligently communicate with those with whom he is doing business.

The Cleveland Railway Company of this city is not concerned with the jitney, as the latter can not compete with three-cent fare; and the field of the jitney in Cuyahoga county will be, and of necessity must be, in the country or interurban districts; and it should be given a fair chance, and all privileges consistent with public safety should be accorded it; but, in return, it should be subject in all respects to the law governing common carriers so far as the transportation of passengers is concerned, and it should be subject to municipal control so far as the use of streets is concerned.

The statutes of this state make it mandatory upon the municipalities to keep their streets open and free and clear from nuisance; and one can readily understand how a jitney bus may become a public nuisance under certain circumstances, so that the necessity for regulation will appeal to any man or ordinary common sense.

For the reasons indicated, the writ will be denied, and the petitioner remanded.